Andrew R. Muehlbauer, Esq.
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone.: (702) 330-4505
Facsimile: (702) 825-0141
Email: Andrew@mlolegal.com

*Attorneys for Lead Plaintiff*
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MINGBO CAI, Individually and On Behalf of All Others Similarly Situated, | Case No. 2:18-cv-01471-JCM-VCF |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| SWITCH, INC., ROB ROY, GABE NACHT, ZAREH SARRAFIAN, DONALD SNYDER, TOM THOMAS, BRYAN WOLF, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BMO CAPITAL MARKETS CORP., WELLS FARGO SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES, JEFFERIES LLC, BTIG, LLC, RAYMOND JAMES & ASSOCIATES, INC., STIFEL, NICOLAUS & COMPANY, INC. and WILLIAM BLAIR & COMPANY, L.L.C., | |
| Defendants | |

AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION .................................................................................. 1

II.   JURISDICTION AND VENUE .......................................................................... 2

III.  PARTIES ............................................................................................................ 2

      A.    Lead Plaintiff ........................................................................................ 2

      B.    Corporate Defendant ........................................................................... 3

      C.    Officer Defendants .............................................................................. 3

      D.    Director Defendants ............................................................................ 4

      E.    Underwriter Defendants ...................................................................... 7

IV.  STATEMENT OF RELEVANT FACTS ........................................................... 8

      A.    Background .......................................................................................... 8

      B.    The Company Conducts Its IPO in October 2017 ............................... 9

      C.    Defendant Roy Was Able to Maintain Complete Control Over the Company Even After the IPO ........................................................... 11

      D.    The IPO Resulted in Financial Windfalls for Switch Executives ....... 11

      E.    Defendants Failed to Disclose in the Registration Statement That Their New Sales Focus Could Lead to a Significant Risk of Lengthening Sales Cycles ................ 12

      F.    Defendants Failed to Disclose in Switch's Registration Statement that Switch's Las Vegas Facility Was Uniquely Situated and Not Scalable .................................... 15

            1.    Defendant Roy Purchased Enron's Facility for Almost Nothing ............... 15

            2.    The Unique Advantages to Switch's Las Vegas Location ......................... 16

            3.    Switch Was Aware That It Was Not Able to Replicate the Success of Its Las Vegas Facility at Its Other New Facilities ........................................... 18

      G.    The Registration Statement Failed to Disclose That $9.4 Million in Booked eBay Revenue Was for Services That Had Yet to Be Performed .................................. 19

V.   DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT ............................. 20

A.   Section 11 Disclosure Requirements.................................................................21

B.   Disclosure Requirements Under Regulation S-K.............................................21

   1.   Item 303 Disclosure Requirements ............................................. 21

   2.   Item 503 Disclosure Requirements ............................................. 23

C.   Defendants Violated Their Disclosure Obligations in the Registration Statement23

VI.   MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT ..............................................................24

A.   Materially False and/or Misleading Statements and Omissions Regarding the Undisclosed Shift in Switch's Sales Strategy .......................................24

B.   Materially False and/or Misleading Statements and Omissions Regarding the Company's Ability to Replicate the Success of Its Las Vegas Facility at Its Other New Facilities.................................................................26

C.   Materially False and/or Misleading Statements and Omissions Regarding the Company's $9.4 Million in Booked eBay Revenue That Was for Services That Had Yet to Be Performed.................................................................27

VII.   CLASS ACTION ALLEGATIONS.................................................................29

VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR.................................30

IX.   CLAIMS.................................................................................................31

X.   PRAYER FOR RELIEF.........................................................................33

XI.   JURY TRIAL DEMANDED ...................................................................33

Lead Plaintiff Oscar Farach ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Switch, Inc. ("Switch " or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Switch; (c) review and analysis of analyst reports regarding the Company; (d) interviews with former Switch employees; and (e) review of other publicly available information concerning Switch, including transcripts of Switch's investor calls. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all individuals and entities that purchased or acquired Switch Class A common stock pursuant and/or traceable to the Company's false and misleading registration statement and prospectus (collectively, the "Registration Statement"), issued in connection with the Company's initial public offering (the "IPO") on or about October 6, 2017, seeking remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Switch, which was founded in 2000, is a technology infrastructure ecosystem corporation whose core business purportedly is the design, construction and operation of advanced data centers.

3.      The claims in this action arise from the materially false and/or misleading Registration Statement issued in connection with the IPO.  In the IPO, the Company ultimately sold 35,937,500 shares of Class A common stock at a price of $17.00 per share.  According to the

Company, Switch received $577.3 million in proceeds, net of underwriting discounts and commissions, but before offering expenses of $4.1 million, in the IPO.

4.     As detailed below, the Registration Statement contained materially false and misleading statements and omitted material information in violation of Sections 11 and 15 of the Securities Act.

5.     As a result of Defendants securities law violations, Plaintiff and the Class have suffered significant losses and damages.  While the Company sold its Class A common stock for $17.00 per share in the IPO, the current price of its stock is approximately $9 per share, a decline of over 47%.

## II.     JURISDICTION AND VENUE

6.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k & 77o).

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

8.     Venue is proper in this District pursuant to § 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b) as the Company conducts business in this District and maintains its principal executive offices in this District.

9.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

### A.     Lead Plaintiff

10.     Lead Plaintiff Oscar Farach, as set forth in his previously-filed certification (Dkt. No. 15-2), incorporated by reference herein, purchased or acquired Switch common stock pursuant

1   or traceable to the Company's Registration Statement issued in connection with the Company's

2   IPO, and was damaged thereby.

3       **B.      Corporate Defendant**

4       11.     Defendant Switch is incorporated in Nevada, and its principal executive offices are

5   located at 7135 S. Decatur Boulevard Las Vegas, NV 89118.  Switch's stock trades under the

6   ticker symbol "SWCH" on the New York Stock Exchange (the "NYSE"), which is an efficient

7   market.  During the Class Period, Switch, through its officers and directors, published periodic

8   filings with the SEC, including its Registration Statement, and made public statements that, as

9

10  alleged herein, contained material misrepresentations and omissions that artificially inflated the

11  price of the Company's securities.

12      **C.      Officer Defendants**

13      12.     Defendant Rob Roy ("Roy") was, at all relevant times, the Chief Executive Officer

14  ("CEO") and Chairman of the Board of Directors of Switch, Inc., including at the time of the IPO

15  and throughout the Class Period.  Defendant Roy has served as CEO and as Chairman of the

16  Board of Managers of Switch, Ltd., which was Switch's primary operating subsidiary.  Defendant

17  Roy first began developing data center facilities in 2000, merging several predecessor companies

18  into Switch, Ltd. after its formation.  Defendant Roy was the founder of Switch.  Defendant Roy

19

20  also signed, or authorized the signing of, the Registration Statement issued in connection with the

21  IPO.

22      13.     Defendant Gabe Nacht ("Nacht") was, at all relevant times, the Chief Financial

23  Officer ("CFO") of Switch, Inc., including at the time of the IPO and throughout the Class Period.

24  Defendant Nacht has served as CFO of Switch, Ltd. since January 2016.   Prior to joining Switch,

25  Ltd., Nacht served as CFO of ClearCapital.com, Inc., a real estate valuations, data analytics, and

26  technology company, from September 2011 to July 2015.  According to the Company, Defendant

27

28  Nacht has over 25 years of corporate finance experience and has served as CFO for several

AMENDED CLASS ACTION COMPLAINT
3

technology and media companies. Defendant Nacht holds an MBA in Corporate Finance from the D'Amore-McKim School of Business at Northeastern University and a B.A. in Political Science from Tufts University.  Defendant Nacht also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO.

14.    Defendants Roy and Nacht are collectively referred to hereinafter as the "Officer Defendants."  The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Switch's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Officer Defendant, during their tenure, was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

### D.    Director Defendants

15.    Defendant Donald Snyder ("Snyder") was, at all relevant times, a member of the Board of Directors of Switch.  Defendant Snyder has also served as a member of the Board of Managers of Switch, Ltd. since 2006.  According to the Company, Defendant Snyder's professional career began with 22 years at First Interstate Bancorp (now Wells Fargo), culminating as Chairman and Chief Executive Officer of the bank's affiliate in Nevada.  Defendant Snyder then moved to the casino hospitality industry, becoming a director and the president of Boyd Gaming Corporation from 1997 until his retirement in 2005.  Following service from 2010 as Dean of the Harrah College of Hotel Administration at the University of Nevada, Las Vegas ("UNLV"), Defendant Snyder served as Acting President of UNLV in 2014.  Since January 2015, he has served as Presidential Advisor at UNLV. Defendant Snyder serves as a director, chair of the Governance Committee, and member of the Risk Committee of Western Alliance Bancorporation, a publicly held commercial bank holding company, and as a director, chair of the Compensation

Committee, and member of the Corporate Governance Committee of Tutor Perini Corporation, a publicly held construction company.  He has served as a director on several public and private company boards, numerous non-profit entities, and several state and local public sector commissions and committees over the past 25 years. His current non-corporate service includes the Smith Center for the Performing Arts (Chairman), the Nathan Adelson Hospice (past Chairman), UNLV Foundation (past Chairman), Clark County School District's Oversight Panel for School Facilities (Chairman), and the Regional Transportation Commission's Transportation Resource Advisory Committee (Chairman). Defendant Snyder holds a Bachelor of Science in Business Administration from the University of Wyoming and completed the Graduate School of Credit & Financial Management at Stanford University.  Defendant Snyder also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO.

16.     Defendant Tom Thomas ("Thomas") was, at all relevant times, a member of the Board of Directors of Switch.  Defendant Thomas has also served as a member of the Board of Managers of Switch, Ltd. since 2004.  Defendant Thomas held various executive positions with Valley Bank of Nevada until its merger with Bank of America in 1992.  After the merger, he became managing partner of Thomas & Mack Co., an investment management and commercial real estate development company with properties and developments in Nevada, California, Arizona and Utah.  He also serves as a director of Southwest Gas Holdings, Inc., a publicly held energy and construction company, where he is a member of the Nominating and Corporate Governance Committee.  Defendant Thomas is a member of the Nevada Bar Association and was instrumental in establishing the Thomas & Mack Legal Clinic and Moot Court Facility at the UNLV Boyd School of Law.  He holds a degree in Finance and a J.D. from the University of Utah.  Defendant Thomas also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO.

17.     Defendant Bryan Wolf ("Wolf") was, at all relevant times, a member of the Board of Directors of Switch.  Defendant Wolf has also served as a member of the Board of Managers of Switch, Ltd. since January 2004.  Since 1997, Defendant Wolf has served in various roles at Intel Capital, and has served as Managing Director, Data Center and Cloud Infrastructure since 2007. Beginning in March 2014, Mr. Wolf has also served as Vice President of Intel Corporation. Defendant Wolf holds a Bachelor of Science degree in Political Science from the University of Oregon and an MBA from the University of Pennsylvania's Wharton School.  Defendant Wolf also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO.

18.     Defendant Zareh Sarrafian ("Sarrafian") was, at all relevant times, a member of the Board of Directors of Switch.  Defendant Sarrafian has also served as a member of the Board of Managers of Switch, Ltd. since January 2017.  He has served as the CEO of Riverside University Health System since May 2014.  Prior to that, Mr. Sarrafian served as Chief Administrative Officer at Loma Linda Medical Center in Loma Linda, California from 1998 to 2014.  He also serves as a director and member of the Nominating and Corporate Governance Committee of Pacific Premier Bancorp, Inc., or Pacific Premier, a publicly held commercial bank holding company, and as a member of the board of directors of Pacific Premier's banking subsidiary, Pacific Premier Bank.  He previously served a director of Security California Bancorp and its banking subsidiary Security Bank of California until they were acquired by Pacific Premier. Defendant Sarrafian received his B.S. from California State Polytechnic University, Pomona, and his M.B.A. from California State University, San Bernardino.  Defendant Serrafian also signed, or authorized the signing of, the Registration Statement issued in connection with the IPO.

19.     Defendants Snyder, Thomas, Wolf, and Sarrafian are collectively referred to hereinafter as the "Director Defendants."

**E.    Underwriter Defendants**

20.    Defendant Goldman, Sachs & Co. ("Goldman Sachs") underwrote the Company's IPO.  Goldman Sachs also acted as a lead bookrunner and representative of the other underwriters and agreed to purchase 8,361,487 shares in the IPO, exclusive of its option to purchase additional shares.

21.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") underwrote the Company's IPO.  J.P. Morgan also acted as a lead bookrunner and a representative of the other underwriters and agreed to purchase 8,361,487 shares in the IPO, exclusive of its option to purchase additional shares.

22.    Defendant BMO Capital Markets Corp. ("BMO") underwrote the Company's IPO.  BMO also acted as a lead bookrunner and a representative of the other underwriters and agreed to purchase 4,013,513 shares in the IPO, exclusive of its option to purchase additional shares.

23.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") underwrote the Company's IPO.  Wells Fargo also acted as a lead bookrunner and a representative of the other underwriters and agreed to purchase 4,013,513 shares in the IPO, exclusive of its option to purchase additional shares.

24.    Defendant Citigroup Global Markets Inc. ("Citigroup") underwrote the Company's IPO.  Citigroup also agreed to purchase 1,750,000 shares in the IPO, exclusive of its option to purchase additional shares.

25.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") underwrote the Company's IPO.  Credit Suisse also agreed to purchase 1,750,000 shares in the IPO, exclusive of its option to purchase additional shares.

26.     Defendant Jefferies LLC ("Jefferies") underwrote the Company's IPO.  Jefferies also agreed to purchase 1,000,000 shares in the IPO, exclusive of its option to purchase additional shares.

27.     Defendant BTIG, LLC ("BTIG") underwrote the Company's IPO.  BTIG also agreed to purchase 500,000 shares in the IPO, exclusive of its option to purchase additional shares.

28.     Defendant Raymond James & Associates, Inc. ("Raymond James") underwrote the Company's IPO.  Raymond James also agreed to purchase 500,000 shares in the IPO, exclusive of its option to purchase additional shares.

29.     Defendant Stifel, Nicolaus & Company, Inc. ("Stifel") underwrote the Company's IPO.  Stifel also agreed to purchase 500,000 shares in the IPO, exclusive of its option to purchase additional shares.

30.     Defendant William Blair & Company, L.L.C. ("William Blair") underwrote the Company's IPO.  William Blair also agreed to purchase 500,000 shares in the IPO, exclusive of its option to purchase additional shares.

31.     Defendants Goldman Sachs, J.P. Morgan, BMO, Wells Fargo, Citigroup, Credit Suisse, Jefferies, BTIG, Raymond James, Stifel, and William Blair are referred to hereinafter as the "Underwriter Defendants"

## IV.     STATEMENT OF RELEVANT FACTS

### A.     Background

32.     Switch is a data center hosting company based in Nevada.  It develops and operates data center facilities through which it provides colocation, telecommunications, cloud services, and content ecosystems for its customers.  Switch's primary business segments are colocation, connectivity, and professional services.

33.     Colocation customers house certain information technology infrastructure equipment—e.g., servers and storage hardware—at Switch's colocation data centers to avoid the

cost of establishing and maintaining their own facilities.  Switch, in turn, leases space to customers and manages the facility, providing services such as power, temperature control, and security.  The majority of Switch's revenue (81.4% of total revenue in FY2016) comes from its colocation segment.

34.   In October 2017, at the time of its IPO, Switch operated ten data center facilities at three campuses, two in Nevada (Las Vegas and Tahoe/Reno) and one in Grand Rapids, Michigan. Switch was also developing an Atlanta campus scheduled to open in 2018.

35.   Switch refers to its campuses collectively as "Primes"  and individually as follows: Las Vegas is "the Core"; Tahoe/Reno is "the Citadel"; Grand Rapids is "the Pyramid"; and Atlanta is "the Keep."

36.   Together, Switch's ten operating colocation facilities comprise four million gross square feet of space.  Over 49% of the space is in Las Vegas while Tahoe/Reno accounts for 36%, and Grand Rapids for 16%.

37.   Switch touts various characteristics that purportedly distinguish it from competitors, including: (1) its intellectual property; (2) the locations of its facilities (in low-tax areas that are not susceptible to natural disasters and that offer cheap renewable power); and (3) a commitment to security.

**B.     The Company Conducts Its IPO in October 2017**

38.   Prior to the IPO, Switch, Ltd. was owned entirely by its members (including Defendant Roy) and was the main operating entity for the Switch business.  In the lead-up to the IPO—on June 13, 2017—Switch, Inc. was incorporated to serve as the issuer of Class A common stock and was to be the sole managing member of Switch, Ltd. following the IPO.

39.   Switch filed the Registration Statement for its IPO on Form S-1 with the SEC on September 8, 2017.  The securities registered pursuant to the Registration Statement were Class A

common stock of Switch.  The Registration Statement was signed "[p]ursuant to the requirements of the Securities Act of 1933" by Defendants Roy, Nacht, Sarrafian, Snyder, Thomas and Wolf.[1]

40.     Subsequent to the filing of the Registration Statement, Switch filed an amendment to the Registration Statement on Form S-1/A on September 25, 2017.  The amendment forms part of the Registration Statement[2] and is substantially similar to the Form S-1 filed on September 8, 2017 and was signed by the same Defendants "[p]ursuant to the requirements of the Securities Act of 1933."

41.     On October 5, 2017, Switch announced the pricing of its IPO of 31,250,000 shares of its Class A common stock at a public offering price of $17.00 per share. The Company further announced that the shares were expected to begin trading on the NYSE on October 6, 2017 and that the Company had granted the underwriters a 30-day option to purchase up to an additional 4,687,500 shares of its Class A common stock from Switch at the initial public offering price, less the underwriting discount and commissions.

42.     Together with the Prospectus filed with the SEC on Form 424B4 on October 10, 2017, the Registration Statement offered for sale 31,250,000 (plus an additional 4,687,500 shares of Class A common stock to the underwriters) at $17.00 per share.  Shares began trading on October 6, 2017 on the NYSE under the ticker symbol "SWCH."

43.     On October 12, 2017, the Company announced the closing of its initial public offering and further announced that the underwriters had executed their option to purchase an additional 4,687,500 Switch shares.

_____

[1] Additionally, Larry Krause signed the Registration Statement. Mr. Krause passed away around the time of the IPO and is not named as a party to this action.

[2] As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement that was filed by the Company on September 8, 2017, all amendments thereto, and the Prospectus filed on Form 424B4 on October 10, 2017, which was incorporated into and formed a part of the Registration Statement that became effective on October 5, 2017.

44.     In the IPO, the Company sold 35,937,500 shares of its Class A common stock, including 4,687,500 shares offered and sold pursuant to an option granted to the underwriters, at a public offering price of $17.00 per share.  Switch received $577.3 million in proceeds, net of underwriting discounts and commissions, but before offering expenses of $4.1 million, in the IPO.

**C.     Defendant Roy Was Able to Maintain Complete Control Over the Company Even After the IPO**

45.     The IPO was structured in a way that gave Defendant Roy complete control of Switch, Inc.   Rather than establishing a tax-advantaged REIT[3] (typical for Switch's peer companies), Defendants established Switch, Inc. as an umbrella partnership C-corporation—an ownership structure with Class A-C equity shares, super-voting rights and majority control by Roy, and a tax-receivable arrangement with its members.   Thus, while investors in the IPO collectively share 100% of the economic interest in Switch, Inc., their Class A common stock yields only a 5.6% voting interest.    Conversely, Defendant Roy's 42.9 million Class C shares, which have 10-1 voting rights, have no economic interest in Switch, Inc. but give Defendant Roy (and an affiliated entity of Defendant Roy) majority control with more than ***67%*** voting power over Switch.

**D.     The IPO Resulted in Financial Windfalls for Switch Executives**

46.     Switch's executives were handsomely rewarded for the completion of the IPO.  For example, Defendant Roy received more than 28 times the compensation in fiscal 2017, the year of the IPO, than in 2016.   In 2016, Defendant Roy received approximately $3.3 million in compensation while in 2017 he received a staggering $94.6 million in compensation.  Likewise, Thomas Morton, the Company's President, General Counsel and Secretary, received more than $12 million in 2017 when he had only received $1.9 million in compensation in 2016.

---

[3] A real estate investment trust, or REIT, is a company that owns, operates or finances income-producing real estate and pays a minimum of 90% percent of its taxable income in the form of shareholder dividends each year.

Additionally, following the IPO, Bloomberg valued Defendant Roy's 17.6% stake in the business at $875 million.

**E.      Defendants Failed to Disclose in the Registration Statement That Their New Sales Focus Could Lead to a Significant Risk of Lengthening Sales Cycles**

47.      Defendants failed to disclose in the Registration Statement that, prior to the IPO, the Company had implemented a new sales strategy that focused on selling hybrid cloud solutions in a manner that presented a significant risk of lengthening the Company's sales cycles due to the increased complication and necessary engineering needed for these more holistic contracts.

48.      On August 13, 2018, Switch issued a press release entitled "Switch Announces Second Quarter 2018 Financial Results," in which the Company lowered its revenue guidance for the rest of the year.  Therein, Defendant Roy, in relevant part, attributed this decrease in revenue guidance to the introduction of a "holistic hybrid cloud solution," which was causing an increase in sales timelines:

> "Switch has introduced a one of a kind holistic hybrid cloud solution that for the first time allows companies to move larger and more mission critical technology environments to our differentiated cloud campus locations. After being introduced to our new product enablement tools, enterprise companies are taking the time to reimagine and reengineer their current use of software, hardware and connectivity as they get ready to embrace the hybrid cloud for their primary mission critical deployments…. Due to this new holistic approach to hybrid cloud solutions, the closing cycles on these projects have extended the sales timelines."

49.      On the same day, August 13, 2018, the Company held a conference call to discuss its Q2 2018 results.  On the call, Erin Thomas Morton, the Company's President, General Counsel & Secretary, announced[4] that:

> After going public in the end of 2017, the business vision for Switch in 2018 has been to focus on strategic enterprise deals that leverage the unique capabilities of our PRIME data centers and thereby create a more valuable hybrid cloud technology infrastructure ecosystem for our customers and to secure a path of sustainable and profitable long-term growth for Switch.

---

[4] To the chagrin of analysts and investors, Defendant Roy has never participated in an investor earnings call even though he is the CEO and controlling shareholder of Switch.

> Today, we are in the process of adding to our business plan by launching the Switch ENTERPRISE ELITE HYBRID CLOUD program. This service advises our clients on 4 future needs pathways to bring about the full enterprise adoption of the cloud, which has been lagging behind in industry projections. We believe that Switch's holistic hyperscale ecosystem approach is unique because it involves a deep dive into a client's needs for: one, elite data center ecosystems; two, enterprise connectivity solutions; three, new software-defined tools and services; and four, a reimagination of enterprise data center equipment.

50.     While Switch executives were announcing this purportedly new business plan for the Company and claiming that the new focus on selling Switch's hybrid cloud solutions to customers was leading to a lengthening of its sales cycles, analysts were surprised by this revelation and the fact that it had impacted the Company's guidance.[5]  An analyst at Cowen and Company, LLC, specifically noted on the earnings call that "the enterprise hybrid cloud strategy, it's the first time I'm hearing about it… [a]nd you're citing that as the explanation for why you've reduced your guidance."  He also asked, "But if I go back to your planning period, which I assume was in October, November, December of last year, sometime in that period, were you assuming that this was going to happen and it's just happening now later than anticipated?"

51.     In response, Defendant Nacht admitted that, since prior to the IPO, the Company's focus was the hybrid cloud environment and selling hybrid cloud services to their customers :

> Well, first of all, Colby, thank you for that. Since our IPO roadshow, we've talked about where we thought compute was going and where we thought the hybrid cloud environment would go, and our focus was on the enterprise and helping them jump start that enterprise migration out of the enterprise-only data centers into a cloud environment. We've talked a lot about the fact that we're building the PRIME campuses for companies' PRIME deployments, their most regulated datasets, their most proprietary datasets, their most high-density datasets. And we fully expect that those enterprises will use the cloud or a significant portion of their compute, and they'll also need an edge deployment. We think that's where compute is going. We've been talking about that very consistently since the IPO road show, frankly.

---

[5] Just the quarter before, the Company had missed consensus estimates as a result of customers delays related to certain larger-footprint deals that took longer-than-expected to close.  On this news, the Company's stock had declined almost 15%, or $2.31 per share, to close on May 15, 2018 at $13.16 per share.

52.     In fact, Defendant Nacht explained that when the Company was planning its guidance for the year that what they were already "finding is these enterprise deals are taking longer."  As Defendant Nacht further explained:

> We've had a number of opportunities, for example, where companies have come to us with several cabinets or several hundred cabinets they would like to move in, but there's a larger opportunity there to talk to them about fully utilizing a hybrid cloud, fully utilizing what our data centers can offer. And these take significantly long – longer to close because we're no longer talking about 100 cabinets or 200 cabinets, we're talking about potential of thousands of cabinets. I think your hypothesis that these enterprise deals are smaller than some of the cloud deployments is, frankly, off base. The enterprise deals that we're talking about, some of them are absolutely as large as any of the cloud deployments out there. And they are complex. They involve the companies buying hundreds of millions of dollars of equipment, making sure their software stack is going to run appropriately, timing when they're going to move from their existing data centers or shut down their existing data centers. And so it does take a logistical planning, and we're finding that some of these are stretching out. We are not finding that any of them are going away, which is tremendously positive for us. So hopefully, that helps answer it.

53.     Following this response, the Cowen analyst asked for clarification on what was different in this new enterprise strategy than what the Company was previously attempting to sell to customers.[6]  In response, Mr. Morton, the Company's President, conceded that "This is not a change of course for the company, it is a refinement of our offerings and being able to express that to the customer in a way that they're beginning to, or they are, understanding and adopting those items."

54.     Analysts did not accept the Company's story that the lengthening of the sales cycle and guidance revisions were due to the purported shift in sales strategy.  As an August 14, 2018 Jefferies analyst report explained, "In our view, enterprise interest in a hybrid cloud architecture is nothing new and expect investor skepticism around the strategic messaging."  Likewise, an August

---

[6] Specifically, Mr. Synesael asked: "Specific to this enterprise strategy, is it that you're selling a broader bundle of services, so you're going to start reselling SDN solutions or data center equipment? I'm just trying to understand what's different in the go-forward solution set, if you will, that you're going to be offering as part of this hybrid offering versus what you were doing previously?"

13, 2018 BTIG analyst report noted that "While we understand that Switch is addressing some of the most complex areas of the market and that these are long term architectural discussions with customers, it is unclear why the new elite hybrid offering is significantly different from their existing offerings."

55.     Therefore, while the Company was representing that it had not shifted its sales approach after the IPO, analysts understood and maintained that the Company's strategy was not as presented in the IPO materials, and that the deviation had an unexpected, deleterious, and still-not-entirely explained,[7] impact on the Company's sales figures and guidance.  Thus, an August 13, 2018 analyst report written by Cowen also refuted Defendant Nacht's contention that this "new" strategy was previously disclosed, stating that: "Adding to the confusion though in our view is that the company had not previously spoken/warned of this shift and equally important no other data center company that we are aware of is seeing similar delays."

56.     After closing on August 13, 2018 at $13.98 per share, the Company's stock tanked $3.13 per share, or more than 22.3%, the following day to close on August 14, 2018, at $10.85 per share, on unusually heavy volume.

**F.     Defendants Failed to Disclose in Switch's Registration Statement that Switch's Las Vegas Facility Was Uniquely Situated and Not Scalable**

**1.     Defendant Roy Purchased Enron's Facility for Almost Nothing**

57.      Since its inception Switch's Las Vegas facility has been uniquely situated and profitable because of several non-replicable advantages.

---

[7] An August 13, 2018 Cowen report noted that the Company's "still weak disclosures limit transparency" and that, at "the same time, the CEO has not participated in an earnings call despite the fact the stock is down 33%  since its October 2017 IPO (excluding the +20% sell-off in today's aftermarket) which in our view has further reduced transparency into the company's thinking."

58.     The Company got its start in 2000, when Defendant Roy began building a data center facility in Las Vegas.  In 2003, Roy merged several predecessor entities to create Switch, Ltd.

59.     Roy began constructing his center near another data facility that was being developed by the Enron Corporation ("Enron").  Beginning in 1998, the "Enron Bandwidth Arbitrage Center"—located near East Sahara Avenue in Las Vegas—was built over a hub of fiber optic cables.

60.     Enron intended to sell bandwidth to internet service providers in a manner approximating a commodity market.  However, in 2002—with only a week left to go before the planned opening of its data facility—Enron declared bankruptcy.  But Enron's fiber optic development plans had been so closely guarded that only its neighbor—Roy—recognized the opportunity this presented.  Enron sold its facility in an "auction" in which Roy was the only bidder.  Roy acquired the property for $930,000—a steep discount from the millions of dollars that Enron had invested.  Because of the infrastructure built by Enron and the fiber hub on the site, Switch is able to purchase bandwidth at significantly below-market rates.

**2.       The Unique Advantages to Switch's Las Vegas Location**

61.     Switch's superior connectivity in Nevada has been one of the Company's primary revenue drivers.  The Enron facility acquired by Switch was linked up to pipes of fiber optic cables serving as the national backbone for 21 information technology companies from around the country.  This gave Switch the ability to transfer massive amounts of data.  The cables, for instance, could transfer the entire contents of the Library of Congress within minutes.  The multitude of network providers in Nevada also granted Switch another benefit—namely, below-market  rates for bandwidth, which allowed Switch to resell purchased bandwidth at lower prices.

62.     A 500-mile, multi-terabyte fiber optic network connects Switch's Las Vegas facility to its Tahoe/Reno facility, and provides connectivity to San Francisco and Los-Angeles. Switch refers to this network as the "SUPERLOOP."   Switch bills the SUPERLOOP as "allow[ing] Switch's more than 1,000 clients to deploy a low-risk, low network latency IT infrastructure for mission-critical workloads" and touts sub-ten millisecond latency between California and Nevada.[8]   The SUPERLOOP also allows Switch's Nevada campuses to be "geographically redundant"—meaning data can be replicated and backed up in the case of a failure at one particular site.

63.     Switch's Nevada operations also benefit from unique access to low-cost power. The Company received regulatory approval in December 2016 to purchase power directly from the broader national power market.   This arrangement is rare—the last time a company achieved this in Nevada was 2005.   Switch also partnered directly with a Nevada utility to construct two solar power stations intended to service its data centers.

64.     Finally, Nevada is one of only four states without any corporate income tax, and of those four states, Nevada is uniquely positioned in proximity to California—which has massive demand for information technology services but comparatively higher taxes and more stringent regulations than Nevada.

65.     Outside of the Registration Statement, Switch management told investors that the Company could replicate key aspects of its business as it expanded into new markets.   For instance, the Company stated that it had the ability to offer the same bandwidth resell services in other markets that it offered in Nevada.   This was inaccurate at best.   Switch's bandwidth resell relationship—under which it purchases bandwidth at below-market rates and passes some of those

---

[8] Latency refers to time delay in transmission of data.

savings to its customers—was negotiated by Roy soon after taking ownership of the Enron facility and reflects the significant connectivity available at that specific location.

        **3.**       **Switch Was Aware That It Was Not Able to Replicate the Success of Its Las Vegas Facility at Its Other New Facilities**

66.      Defendants were aware that it was highly unlikely that they would be able to replicate the success of the Las Vegas facility at their other newer locations. Grand Rapids and Atlanta have diminished connectivity opportunity compared to Las Vegas, with its existing infrastructure, competitive market for bandwidth, and proximity to California.

67.      Grand Rapids, for example, lacks established data centers. There are approximately 12 network connectivity providers in the area, compared to 62 in Las Vegas. And while the Company billed Grand Rapids as a logical extension of Switch's business model, other Company releases suggest it was little more than a lark motivated by Roy's fascination with fortified structures:

> And a friend of Rob's called him and said, "Would you consider Grand Rapids?" Rob said, "Of course. We'll consider anything. What do you have?" He said, "Well, I have some property there. I'll send you some info." So he sent Rob a YouTube video link that his realtor had made of a 660,000 square foot concrete and steel pyramid. Rob, of course, called him back and said, "Next time lead with, 'I have a pyramid.'"

68.      Similarly, while Switch emphasized Grand Rapids' low-disaster location and compared it favorably to Nevada, the Company was unprepared for the cold climate and was forced to allocate capital to respond to cold snaps.

69.      The Company's Atlanta facility, which was supposed to open well after the IPO, faced additional substantial issues that made it non-comparable to Las Vegas. For example, there was already an established competitive landscape in the Atlanta area, and overall demand was lower given the regional/enterprise characteristics of the Atlanta market. Indeed, at the time of the IPO, Switch had been unable to secure an anchor tenant for Atlanta.

70.     As a result, despite the Company's significant investments in the Grand Rapids and Atlanta facilities, the vast majority of Switch's revenue is attributable to Las Vegas alone.  For example, 94.6% of Switch's revenue for the first nine months of 2017 was attributed to Las Vegas.  Nevertheless, Switch represented that the Grand Rapids and Atlanta facilities were similarly situated and scalable as the Las Vegas facility.

**G.     The Registration Statement Failed to Disclose That $9.4 Million in Booked eBay Revenue Was for Services That Had Yet to Be Performed**

71.     The Registration Statement contained false and/or misleading information and material omissions concerning Switch's existing and projected financial performance. During the Company's 2017 fiscal year, Switch reported $9.4 million in revenue attributable to eBay for colocation services that had not yet been performed and would not actually be used until the 2018 fiscal year.  As such, Switch reported improperly inflated 2017 fiscal year revenue growth, which means that the corresponding 2018 revenue growth was thus negatively impacted by the same amount.  Neither of these facts were disclosed in the Company's Registration Statement.

72.     This improper inclusion of revenue resulted in a substantial overstatement of the amount of growth Switch saw in the first six months of its 2017 fiscal year, as compared to the first six months of its 2016 fiscal year.  The Company reported in the Registration Statement that recurring revenue had increased from $148.5 million to $177.2 million—approximately 20%. This is inaccurate, however, since it improperly included the $9.4 million in prematurely recognized revenue. If that $9.4 million had been excluded (as it should have been), then Switch would have reported $167.8 million in recurring revenue, which comes out to approximately 13% growth.  In the Registration Statement, Switch stated that recurring revenue was one of their "Key Metrics" for evaluating their business and assessing strategies.  This figure, however, was overstated by more than half (approximately 53%) in the Registration Statement.

73.     Defendants would have certainly been aware of the nature of this eBay transaction as eBay was Switch's largest client, accounting for almost 10% of Switch's business, when the deal at issue closed in 2016.  As Defendant Nacht explained in April 2018, the "$9.4 million revenue impact due to fees booked in 2017 related to a 7-year $280 million contract closed in 2016 with a strategic customer to reserve space at one of our facilities."

74.     Moreover, the failure to disclose the nature of this transaction was even more misleading due to the fact that, according to an analyst at Cowen, eBay's business with Switch was dropping off significantly from 2017 to 2018, in part because of the departure of a key executive at eBay in March of 2016.  This fact was omitted from the Registration Statement.

## V.     DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT

75.     "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

76.     To effectuate this purpose, a Company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the

Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering"); *see also* 15 U.S.C. § 77k(a).

### A.    Section 11 Disclosure Requirements

77.    Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security."  15 U.S.C. § 77k(a)(1)-(5).

### B.    Disclosure Requirements Under Regulation S-K

#### 1.    Item 303 Disclosure Requirements

78.     Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way."  *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required.  *Id.*

79.    Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

      i.     Describe any *unusual or infrequent events or transactions* or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

      ii.    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also S.E.C. Release No. 6835*, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

80.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.  Examples of such *required* disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4 (May 18, 1989).

81.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *Id.* at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be

disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

### 2.    Item 503 Disclosure Requirements

82.    Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform*, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004).  Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c).  The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

*Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers*, 1998 WL 425894, at *14 (July 29, 1998).

### C.    Defendants Violated Their Disclosure Obligations in the Registration Statement

83.    Defendants violated their disclosure obligations in the Registration Statement because they failed to disclose that: (a) prior to the IPO, the Company had implemented a new sales strategy that focused on selling hybrid cloud solutions in a manner that presented a significant risk of lengthening the Company's sales cycles due to the increased complication and necessary engineering needed for these more holistic contracts; (b) it was highly unlikely that they would be able replicate the success of the Las Vegas facility at their other new locations due to unique characteristics of the Las Vegas facility and marketplace; (c) Switch's revenue figures were inflated by the inclusion of $9.4 million in revenue for services that would not be used by its client, eBay, until the next fiscal year; and (d) as a result, the Company's 2018 revenue would be likewise impacted by approximately $9.4 million.  Their failure to disclose these material facts and

risks violated Section 11 and Item 503. Additionally, Defendants' failure to disclose Switch's transition away from its sales strategy into one focused on selling hybrid cloud solutions also violated Item 303 given that Switch was actively engaged in a business strategy that it reasonably expected to have a material, unfavorable impact on revenues or income from continuing operations. Likewise, Defendants failure to disclose that the Company's 2018 revenue would be adversely impacted by approximately $9.4 million violated Item 303.

## VI. MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

84. Switch sold 35,937,500 shares of its Class A common stock in the IPO pursuant to the Registration Statement. The Registration Statement contained untrue statements of material facts and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.

### A. Materially False and/or Misleading Statements and Omissions Regarding the Undisclosed Shift in Switch's Sales Strategy

85. The Registration Statement explained in a section entitled "Industry Limitations" that:

> Given the limitations of both the public cloud and the enterprise-built facilities, we expect enterprises to increasingly deploy IT equipment across hybrid cloud and colocation environments, with mission critical data stored at highly resilient and secure colocation facilities.

86. This statement identified in Paragraph 85 above, which was also made elsewhere in the Registration Statement, was materially false and misleading when made because, as explained in Section IV.E, *supra*, it failed to disclose that, prior to the IPO, the Company had already implemented a new sales strategy that focused on selling hybrid cloud solutions to attempt to meet this purposed need by enterprises.

87. The Registration Statement contained numerous statements regarding the fact that a risk of Switch's business was that the Company could have long selling and implementation

cycles for its services.  For example, the Registration Statement disclosed that "we face risks associated with having a long selling and implementation cycle for our services that requires us to make significant time and resource commitments prior to recognizing revenue for those services."

88.     Likewise, in the section of the Registration Statement entitled "Risks Related to Our Business," the Company disclosed:

> **We face risks associated with having a long selling and implementation cycle for our services that requires us to make significant time and resource commitments prior to recognizing revenue for those services.**
>
> We often have a long selling cycle for our largest transactions, which can range from a few months to up to a year or more. This can require our customers and us to invest significant capital, human resources and time prior to receiving any revenue. A customer's decision to utilize our colocation services or our other services often involves time-consuming contract negotiations and substantial due diligence on the part of the customer regarding the adequacy of our infrastructure and attractiveness of our resources and services. Furthermore, we may expend significant time and resources in pursuing a particular sale or customer, and we do not recognize revenue for our services until such time as the services are provided under the terms of the applicable contract. Our efforts in pursuing a particular sale or customer may not be successful, and we may not always have sufficient capital on hand to satisfy our working capital needs between the date on which we sign an agreement with a new customer and when we first receive revenue for services delivered to the customer. If our efforts in pursuing sales and customers are unsuccessful, or our cash on hand is insufficient to cover our working capital needs over the course of our long selling cycle, our financial condition could be negatively affected.

89.     Additionally, another risk warning explained that "[o]ur sales cycle could also be lengthened if customers reduce spending on, or delay decision-making with respect to, our services, which could adversely affect our revenue growth and our ability to recognize revenue."

90.     The statements and risk factors identified in Paragraphs 87-89 were themselves materially false and misleading when made because, as explained in Section IV.E, *supra*, they failed to disclose that Switch had already implemented a new sales strategy that focused on selling hybrid cloud solutions in a manner that presented a significant risk of lengthening the Company's sales cycles due to the increased complication and necessary engineering needed for these more

holistic contracts.  Nowhere in the Registration Statement did Defendants disclose that there were any additional sale cycle risks attributable to the new sales strategy, which was a material risk known to Defendants at the time of the IPO.

> **B.    Materially False and/or Misleading Statements and Omissions Regarding the Company's Ability to Replicate the Success of Its Las Vegas Facility at Its Other New Facilities**

91.    While Switch was aware that it was unable to replicate the success of its Las Vegas facility at its other locations, the Registration Statement failed to disclose this fact.  Instead, Switch misled investors by claiming that all of its facilities had the same characteristics that had made its Las Vegas facility so successful without disclosing the substantial differences between the Las Vegas facility and the others.  *See* Section IV. F, *supra*.

92.    For example, in a section entitled "Our Growth Strategy," the Registration Stated:

> **Expand into New Geographies in the United States.**    We intend to continue to evaluate geographic expansion opportunities for our data center facilities, focusing on areas within the United States with limited or no natural disaster risks, favorable business and tax climates, close proximity to major cities, robust telecommunications networks, and significant customer demand. For example, we recently secured land for The Keep Campus to expand geographically into the southeast and mid-Atlantic United States. We believe this approach, combined with our ability to deploy capital efficiently through our modular design, reduces the risks associated with our geographic expansion and enhances the strategic value of our new locations.

93.    The Registration Statement also touted the similarities between its facilities:

> The Core Campus in Las Vegas, Nevada; The Citadel Campus near Reno, Nevada; and The Pyramid Campus in Grand Rapids, Michigan. In addition, we recently purchased land to develop a fourth Prime, The Keep Campus, in Atlanta, Georgia. ***Our Primes are strategically located in geographies that combine a low risk of natural disaster, favorable tax policies for customers deploying computing infrastructure and low latency connectivity to major metropolitan markets, such as Los Angeles, San Francisco, Silicon Valley, Chicago, New York, Northern Virginia and Miami. As a result, customers in these metropolitan markets can access our advanced colocation facilities while reducing exposure to the higher taxes, higher cost of power and higher risk of natural disaster that might be prevalent in other markets.***

*      *      *

*We carefully chose the locations of our U.S. campuses based on characteristics that we believed would help drive resiliency, performance and cost efficiencies for our customers. Our Prime campus locations are located in areas with low natural disaster risk.* For example, the State of Nevada boasts the lowest natural disaster rating in the Western United States. *Additionally, each of these locations offers favorable tax and economic development policies that provide zero or low-tax environments for our customers to deploy IT equipment. While all of our locations offer a lower-cost source of 100% renewable power, there are additional efficiency advantages.* For example, the Nevada climate is characterized by low humidity and relatively stable temperatures for most of the year. This improves cooling efficiencies and reduces power consumption. We own most of our facilities, and where the land and shell are not owned, we hold long-term leases on those assets. [Emphasis added.]

94. Additionally, the Registration Statement claims that "[a]s our platform and customer base expands, we continue to realize growing efficiencies of scale, which allows us to provide higher value services to our customers." Moreover, the Registration Statement touts that "[e]ach of our hyperscale PRIME retail data centers are masterfully managed and maintained to ensure extraordinary client service."

95. All of the discussion in the Registration Statement regarding the similarities between all of the facilitates, the Company's efficiencies of scale, and similarities between the management and structure of each facility give the false impression that the Company's non-Las Vegas facilities would be as profitable as the Las Vegas facility actually was. Therefore, the statements identified in Paragraphs 92-94 above, were materially false and misleading when made because, as explained in Section IV. F, *supra*, they failed to disclose that the profitability of the Las Vegas facility was due to unique circumstances that were not available to the Company's other facilities.

C. **Materially False and/or Misleading Statements and Omissions Regarding the Company's $9.4 Million in Booked eBay Revenue That Was for Services That Had Yet to Be Performed**

96. The Registration Statement represented that:

[Switch] calculate[s] recurring revenue as contractual revenue under signed contracts calculated in accordance with GAAP for the applicable period. Recurring revenue does not include any installation or other one-time revenue, which would

be classified as non-recurring revenue. Management uses recurring revenue as a supplemental performance measure because it provides a useful measure of increases in contractual revenue from our customers and provides a baseline revenue measure on which to plan expenses.

97.    The Registration Statement further explained that:

Revenue from recurring revenue streams is generally billed monthly and recognized ratably over the period to which the service relates.

98.    The statements identified in Paragraphs 96-97 above, were materially false and misleading when made because, as explained in Section IV.G, *supra*, they failed to disclose that Switch was not recognizing revenue in the applicable period for which services relate.   As explained above, the Company had reported $9.4 million in revenue (for customer eBay) for colocation services that had not yet been performed and would not actually be used until the 2018 fiscal year

99.    Additionally, the Registration Statement repeatedly stated that the Company's recurring revenue for the six months that ended on June 30, 2017 was $177,213,000.   This statement was materially false and misleading because the Company was improperly including the $9.4 million in eBay revenue, which overstated the Company's recurring revenue.

100.    Moreover, the Registration Statement touted in a section entitled "Quarterly Trends in Revenue" that Switch's "quarterly revenue increased in each period presented primarily due to an increase in the sale of our services as a result of the construction and expansion of our data centers, increasing brand awareness and the success of our sales efforts with existing customers and new customers."  This statement was materially false and misleading because the Company's revenue would not have increased each quarter if not for the improper inclusion of the $9.4 million in revenue.

101.    According to the Registration Statement, the Company monitors recurring revenue as a key metric to "help us evaluate our business, identify trends affecting our business, formulate

business plans and make strategic decisions."  The Registration Statement, however, failed to disclose a known trend affecting its business related to this purported key metric.

## VII.    CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired Switch Class A common stock pursuant and/or traceable to the Company's false and misleading IPO Registration Statement, seeking remedies under Sections 11 and 15 of the Securities Act.  Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

103.    While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Switch shares were issued in the IPO. Record owners and other members of the Class may be identified from records maintained by Switch or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

- whether the Registration Statement contained any material misrepresentations or omissions;

- whether the Individual Defendants have a viable "due diligence" defense to the strict liability imposed by Sections 11 of the Securities Act;

- whether Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Sections 11 of the Securities Act;

- whether the Individual Defendants are control persons of Switch for purposes of Section 15 of the Securities Act;

- whether the federal securities laws were violated by Defendants' acts as alleged herein; and

- to what extent members of the Class have sustained damages and the proper measure of those damages.

107. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs complained of herein. Moreover, there will be no difficulty in the management of this action as a class action.

## VIII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

108. Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO. The safe harbor provision of § 27A of the Securities Act, 15 U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with the initial public offering," which includes all of the false and misleading statements made in connection with the IPO alleged herein.

IX.     CLAIMS

**FIRST CLAIM**
**Violations of Section 11 of the Securities Act**
**Against All Defendants**

109.    Plaintiff repeats and re-alleges each allegation contained above as if fully set forth herein.  This claim is based solely on strict liability and negligence, and expressly disclaims any allegation of fraud or intentional misconduct.

110.    This claim is asserted against all Defendants and is based on Section 11 of the Securities Act.  The Individual and Officer Defendants were directors and/or officers of Switch, and signed and/or authorized the signing of the Registration Statement in connection with the IPO. The Underwriter Defendants served as underwriters in the IPO.

111.    The Registration Statement contained untrue statements of material fact and omitted material facts necessary to render those statements not misleading.

112.    Plaintiff and members of the Class acquired shares pursuant and/or traceable to the Registration Statement.

113.    At the time Plaintiff and members of the Class obtained their shares, they did so without knowledge of the true facts concerning the misstatements or omissions alleged herein.

114.    Defendant Switch is strictly liable to Plaintiff and all other persons who purchased or otherwise acquired shares sold pursuant to the Registration Statement.

115.    Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate.  Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained

misrepresentations and/or omissions of material fact.  As such, Defendants are strictly liable to Plaintiff and the Class.

116.   Plaintiff and the members of the Class have sustained damages.  The value of their shares has declined substantially, subsequent to, and due to, Defendants' Securities Act violations.

117.   Because of the foregoing, Plaintiff and the members of the Class are entitled to damages under Section 11 of the Securities Act.

### SECOND CLAIM
### Violations of Section 15 of the Securities Act
### Against the Officer and Director Defendants

118.   Plaintiff repeats and re-alleges each allegation set forth contained above as if fully set forth herein.  This claim is based solely on strict liability and negligence, and expressly disclaims any allegation of fraud or intentional misconduct.

119.   This claim is asserted against the Officer and Director Defendants and is based on Section 15 of the Securities Act.

120.   The allegations alleged above, and incorporated into this claim, demonstrate a primary violation of Section 11 of the Securities Act.

121.   The Officer and Director Defendants, due to their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Switch within the meaning of Section 15 of the Securities Act.  The Officer and Director Defendants had the power, influence, and knowledge—and exercised the same—to cause Switch to engage in the acts described herein.

122.   The Officer and Director Defendants, at all relevant times, participated in the operation and management of Switch, and conducted and participated, directly and indirectly, in the conduct of Switch's business affairs.  The Officer and Director Defendants were under a duty to disseminate accurate and truthful information with respect to Switch's financial condition and

prospects.  Because of their positions of control and authority as officers and directors of Switch, the Individual Defendants were able to, and did, control the contents of the Registration Statement (including the IPO Prospectus), which contained materially untrue and/or misleading statements and/or omitted to state material facts required to be stated therein.

123.    Because of their conduct, the Officer and Director Defendants are liable under Section 15 of the Securities Act to Plaintiff and the members of the Class who purchased or acquired shares pursuant to the Registration Statement.  As a direct and proximate result of the Officer and Director Defendants' wrongdoing, Plaintiff and the other members of the Class suffered damages in connection with their purchase and acquisition of shares pursuant to the Registration Statement.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law; and

(e)    Such other and further relief as the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

1

Respectfully submitted,

2   DATED: October 12, 2018

**GLANCY PRONGAY & MURRAY LLP**

3

4

By:  *s/ Robert V. Prongay*
Lionel Z. Glancy

5   Robert V. Prongay
Casey E. Sadler

6   Lesley F. Portnoy
1925 Century Park East, Suite 2100

7   Los Angeles, CA 90067
Telephone: (310) 201-9150

8   Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com

9           rprongay@glancylaw.com

10          csadler@glancylaw.com
            lportnoy@glancylaw.com

11

12   *Lead Counsel for Lead Plaintiff and the Class*

13   **MUEHLBAUER LAW OFFICE, LTD.**
Andrew R. Muehlbauer, Esq.

14   7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117

15   Telephone.: (702) 330-4505
Facsimile: (702) 825-0141

16   Email: Andrew@mlolegal.com

17

18   *Liaison Counsel for Lead Plaintiff*

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

     I, Robert V. Prongay, hereby certify that this document filed through the ECF system will

3

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

4

and paper copies will be sent to those indicated as non-registered participants on October 12,

5

2018.

6

Dated: October 12, 2018

7

                                  */s/ Robert V. Prongay*
                                  Robert V. Prongay

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 2:18-cv-01471-JCM-VCF Cai v. Switch, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Todd L. Bice**
  lit@pisanellibice.com,cmc@pisanellibice.com,tlb@pisanellibice.com,dhh@pisanellibice.com

- **Mark E Ferrario**
  ferrariom@gtlaw.com,rosehilla@gtlaw.com,lvlitdock@gtlaw.com,sheffieldm@gtlaw.com

- **Lionel Z. Glancy**
  INFO@GLANCYLAW.COM,lglancy@glancylaw.com

- **Michele D Johnson**
  michele.johnson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,kristen.fechner@lw.com

- **Patrick R. Leverty**
  pat@levertylaw.com,staff@levertylaw.com,patleverty@gmail.com

- **Christopher R Miltenberger**
  miltenbergerc@gtlaw.com,rosehilla@gtlaw.com,lvlitdock@gtlaw.com

- **Andrew R. Muehlbauer**
  andrew@mlolegal.com,witty@mlolegal.com,sean@mlolegal.com

- **Brian O. O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert V. Prongay**
  rprongay@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Ava M. Schaefer**
  ams@pisanellibice.com,lit@pisanellibice.com,cct@pisanellibice.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Andrew          R. Gray
Latham & Watkins
650 Town Center Dr.
Costa Mesa, CA 92626
```

**Joshua          G. Hamilton**
Latham & Watkins LLP
10250 Constellation Blvd  Ste 1100
Los Angeles, CA 90067

**Kendall          Howes**
Latham & Watkins LLP
355 South Grand Ave
Suite 100
, CA 90071

**Lesley          F. Portnoy**
Glancy Prongay & Murray LLP
1925 Century Park East  Ste 2100
Los Angeles, CA 90067

**Casey          Sadler**
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067