UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| MINGBO CAI, *Individually and On Behalf of All Others Similarly Situated*, <br><br> Plaintiffs, <br><br> v. <br><br> SWITCH, INC., *et al.*, <br><br> Defendants. | Case No. 2:18-cv-01471-JCM-VCF <br><br><br> ORDER |

Presently before the court is Magistrate Judge Cam Ferenbach's report and recommendation. (ECF No. 88). Plaintiff Oscar Farach filed an objection (ECF No. 89), to which defendants Switch, Inc. ("Switch"); Rob Roy, Gabriel Nacht, Zareh Sarrafian, Donald Snyder, Tom Thomas, and Bryan Wolf (collectively "defendants") responded (ECF No. 90).

Also before the court is defendants' motion to strike. (ECF No. 63). Farach filed a response (ECF No. 79), to which defendants replied (ECF No. 85).

Also before the court is defendants' motion to dismiss. (ECF No. 60). Farach filed a response (ECF No. 78), to which defendants replied (ECF No. 84).

**I.    Facts**

Farach has brought forth this putative securities class action challenging Switch's failure to include certain information in the registration statement and prospectus that Switch issued in connection with its initial public offering ("IPO"). (ECF No. 58). The amended complaint contains the following allegations:

Switch is a Nevada corporation that hosts data centers and provides to its customers colocation, telecommunications, cloud, and content ecosystems services. *Id*. Most of Switch's

revenue comes from colocation services, which amounted to 81.4% of total revenue in fiscal year 2016. *Id*. Colocation services are rental agreements where customers lease information technology infrastructure, such as servers and storage hardware, to avoid the cost of establishing and maintaining their own facilities. *Id*.

Roy was at all relevant times to this lawsuit Switch's chief executive officer ("CEO") and chairman of the board of directors. *Id*. In 2000, Roy founded Switch and began building a data center in Las Vegas near another data center that Enron Corporation ("Enron") was constructing. *Id*. In 2002, Enron declared bankruptcy a week before it planned to open its data center. *Id*. Roy subsequently acquired the state-of-the-art facility at a steep discount, which allowed Switch to transfer massive amounts of data at below market rates. *Id*.

Although Switch established other data centers over the years, the Las Vegas data center remained as the company's primary source of revenue. *Id*. Several market advantages, in addition to Roy's shrewd acquisition of the facility, are responsible for this success. *Id*. The Las Vegas data center is part of a fiber optic network that connects to Switch's Tahoe/Reno data center, San Francisco, and Los Angeles. *Id*. Switch also purchases power in Nevada at low costs because it is authorized to directly deal with the national power market. *Id*. Lastly, Nevada does not impose a corporate income tax and is adjacent to California, which has a large demand for information technology services. *Id*.

In 2017, Switch began changing its sales strategy to focus on selling hybrid cloud solutions, which would allow customers to move larger technology operations to Switch's data centers. *Id*. This new strategy presented a significant risk of lengthening sales timelines because it involved new complications and required engineering. *Id*. Switch did not disclose this shift in strategy and that it would likely have an adverse effect on revenue. *Id*.

On June 13, 2017, Switch registered as a corporation so that it can issue class A common stock in an IPO. *Id*. On September 8, 2017, Switch filed the registration statement for its IPO with the Securities and Exchange Commission ("SEC") and, on September 25, 2017, Switch amended the registration statement and the prospectus therein. *Id*. The registration statement included Switch's offer to sell 31,250,000 shares, with an option for the underwriters to purchase

an additional 4,687,400 shares, at $17.00 per share. *Id*.

Switch discussed in the registration statement its growth strategy, which involved developing new facilities in Grand Rapids, Michigan and Atlanta, Georgia. *Id*. However, the registration statement did not disclose facts explaining that these new facilities lacked the unique market advantages that made the Las Vegas data center successful. *Id*. The registration statement also failed to disclose that Switch had changed its sales strategy to focus on hybrid cloud solutions. *Id*. Lastly, the registration statement reported that Switch's recurring revenue for the first six months of 2017 was $177,213,000.00. *Id*. This figure included $9,400,000.00 for colocation services that eBay would use in 2018. *Id*. Had Switch not including this amount in the recurring revenue, Switch's revenue growth would have been 13% rather than 20%. *Id*.

On October 6, 2017, shares in Switch began trading on the New York Stock Exchange. *Id*. Six days later, Switch announced the closing of its IPO and that the underwriters executed their option to purchase an additional 4,687,400 shares. *Id*. In total, Switch sold 35,937,500 shares of class A common stock and received $577,300,000.00 in proceeds. *Id*. Switch also incurred $4,100,000.00 in offering expenses. *Id*.

On August 13, 2018, Switch issued a press release in which the company lowered its revenue guidance for the rest of the year. *Id*. Switch attributed this decrease in expected revenue to its shift in sales strategy towards selling hybrid cloud solutions. *Id*. Switch's chief financial officer ("CFO") and president, Nacht and Thomas Morton respectively, also stated that Switch had been working on hybrid cloud solutions for a while and that the company was not actually changing its sales approach. *Id*. Analysts critiqued the sales strategy for not being as presented in the IPO materials and that the deviation in sales figures was unexpected. *Id*. The next day, Switch's stock dropped 22.3%—from $13.98 per share to $10.85 per share. *Id*.

In sum, the alleged misleading statements and omissions in the registration statement allowed Switch to sell its class A common stock at $17.00 per share. *Id*. Since the IPO, Switch's stock price has decreased to approximately $9 per share, over a 47% drop. *Id*. Farach alleges that, had Switch filed a registration statement with adequate disclosures, the purported class would not have incurred substantial losses in the form of decreased stock prices. *Id*.

## II. Procedural History

On June 11, 2018, plaintiff Mingbo Cai initiated this action. (ECF No. 1). In the amended complaint, lead plaintiff Farach alleges two causes of action: (1) violation of section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, and (2) section 15 of the Securities Act, 15 U.S.C. § 77o. (ECF No. 58).

Now, defendants move to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6) and strike paragraphs 45, 46, 56, and 65, and footnotes 4 and 7, from the amended complaint. (ECF Nos. 60, 63). Magistrate Judge Ferenbach recommends striking paragraphs 45 and 46, and footnotes 3, 4, and 7. (ECF No. 88).

## III. Legal Standard

*a. Report and recommendation*

This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." 28 U.S.C. § 636(b)(1).

Where a party fails to object, however, the court is not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Indeed, the Ninth Circuit has recognized that a district court is not required to review a magistrate judge's report and recommendation where no objections have been filed. *See United States v. Reyna-Tapia*, 328 F.3d 1114 (9th Cir. 2003) (disregarding the standard of review employed by the district court when reviewing a report and recommendation to which no objections were made).

*b. Failure to state a claim*

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed

factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

"Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. 662, 678 (citation omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, the court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 678–79. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 678.

Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678.

Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but not shown—that the pleader is entitled to relief." *Id.* (internal quotation marks omitted). When the allegations in a complaint have not crossed the line from conceivable to plausible, plaintiff's claim must be dismissed. *Twombly*, 550 U.S. at 570.

The Ninth Circuit addressed post-*Iqbal* pleading standards in *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The *Starr* court stated, in relevant part:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Id.*

**IV.    Discussion**

Two motions and one report and recommendation are pending before the court. First, the court will adopt in part and reject in part Magistrate Judge Ferenbach's recommendation and strike footnotes 4 and 7 from the amended complaint. Second, the court will grant in part and deny in part defendants' motion to dismiss.

*a. Report and recommendation*

Magistrate Judge Ferenbach recommends that the court strike paragraphs 45 and 46, and footnotes 3, 4, and 7, from the amended complaint. (ECF No. 88). Farach filed a timely objection to the report and recommendation. (ECF No. 89). Therefore, the court engages in a *de novo* review to determine whether to adopt the magistrate judge's recommendation. *See* 28 U.S.C. § 636(b)(1).

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispending with those issues prior to trial[.]" *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

Farach alleges in paragraph 45 and footnote 3 that the IPO gave Roy complete control of Switch by incorporating the company as a C-corporation where class A common stock yields only a 5.6% voting interest. (ECF No. 58). In contrast, Roy's class C shares have 10-1 voting rights, giving him a 67% voting power over the company. *Id*. Farach alleges in paragraph 46 that Roy and Morton were highly compensated for the IPO. *Id.* Roy allegedly received $94,600,000.00 and his stake in Switch after the IPO was $875,000,000.00. *Id*. Morton allegedly received $12,000,000.00. *Id*.

"Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005) (citing 15 U.S.C. § 77o). The facts alleged in paragraphs 45 and 46, and footnote 3, show that Roy had control over the IPO process because Roy structured the IPO

6

in a manner that gave him a controlling stake in the company and significant financial benefits. Thus, because these allegations are material to Farach's section 15 claim and do not substantially raise other Rule 12(f) concerns, the court will not strike paragraphs 45 and 46, and footnote 3, of the amended complaint. *See Whittlestone*, 618 F.3d at 973–75.

Farach alleges in footnotes 4 and 7 that Switch's history of weak disclosures limit transparency and that Roy never participated in an investor earnings call despite being the CEO and controlling shareholder of Switch. (ECF No. 58). Farach generally remarks that the court should not strike these footnotes because they do not waste resources or prejudice the defendants. (ECF No. 89). However, the heart of the magistrate judge's finding is that these footnotes are all but irrelevant to determining whether defendants committed a section 11 violation. *See* (ECF No. 88). The court agrees with the magistrate judge. Switch's history of disclosure and Roy's participation in investor earnings calls are too attenuated from any alleged misleading statements or material omissions in the registration statement to survive a Rule 12(f) motion.

The magistrate judge also recommends that the court deny defendants' Rule 12(f) motion as it pertains to paragraphs 56 and 65. *Id*. Defendants have not objected to the recommendation. Nevertheless, the court conducted a *de novo* review and finds good cause to adopt the magistrate judge's finding as it pertains to paragraphs 56 and 65.

    b. *Failure to state a claim*

Defendants move to dismiss Farach's section 11 and section 15 claims. (ECF No. 60). The court addresses each in turn.

        i. *Section 11 of the Securities Act*

Section 11 of the Securities Act imposes liability on an issuer of a security if the corresponding registration statement "contained an untrue statement of material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a). To state a section 11 claim, a plaintiff must allege "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her

7

investment." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quotation marks and citation omitted).

A heightened pleading standard does not typically apply to section 11 claims. *Id*. However, when the complaint sounds in fraud, plaintiffs must allege their causes of action with particularity under Federal Rule of Civil Procedure 9(b). *In re Rigel Pharm. Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012). Farach alleges that the defendants negligently signed the registration statement, which contained material misrepresentations and omissions. (ECF No. 58). A securities claim based on negligence does not sound in fraud because it does not rely on a "unified course of fraudulent conduct[.]" *Rubke*, 551 F.3d at 1161. Therefore, the notice pleading standard under Rule 8(a) applies to Farach's section 11 claim.

Farach alleges that defendants violated section 11 by (1) failing to disclose that Switch implemented a new sales strategy that presented a significant risk of adversely affecting revenue; (2) failing to disclose unique characteristics and circumstances of the Las Vegas data center that did not exist at other locations, making it highly unlikely that Switch could replicate the success of the Las Vegas data center; and (3) misrepresenting Switch's revenue by improperly including $9,400,000.00 for services that eBay would not use until the next fiscal year. (ECF No. 58).

*1. Switch's new sales strategy*

Regulation S-K governs the non-financial statement portion of registration statements. 17 C.F.R. § 229.10. Item 303 of regulation S-K requires an issuer of a security to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation." 17 C.F.R. § 229.303(a)(3)(ii). Failure to comply with item 303 constitutes a violation of section 11. *Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998).

Defendants note that the registration statement discussed that hybrid cloud solutions are a remarkable growth opportunity and that Switch expects to take advantage of that opportunity. (ECF No. 60). However, the sections which defendants quote do not indicate that Switch had already changed its sales strategy to focus on hybrid cloud solutions. *See id*. Based on the allegations in the complaint, Switch's strategy presented a serious risk of diminishing revenue

8

due to new complications and required engineering. (ECF No. 58). Therefore, the complaint sufficiently alleges facts from which a reasonable jury could find that Switch violated Item 303 by failing to disclose its new sales strategy. *See Durning v. First Boston Corp.*, 815 F.3d 1265, 1268 (9th Cir. 1987) ("... adequacy of disclosure is normally a jury question.").

Similarly, item 503 of regulation S-K requires "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). The registration statement must include an explanation of "how the risk affects the issuer or the securities being offered." *Id*. Although the prospectus includes over thirty pages of risk disclosures, defendants identify only general statements that the company faced risks associated with long selling and implementation cycles. (ECF Nos. 60, 62-1). These kinds of boilerplate risk factors do not satisfy the requirements set forth in item 503. *See Plain English Disclosure, Securities Act Release No. 33–7497*, 63 Fed. Reg. 6370–01, 1998 WL 44199 (Feb. 6, 1998).

The court is not aware of any language in the registration statement that indicates the specific risks arising from Switch's new sales strategy. *See* (ECF No. 62-1). Further, Farach alleges that once Switch disclosed its sales strategy along with its potential effects on revenue, Switch's stock price dropped by 22.3%. (ECF No. 58). This is precisely the type of risk that item 503 requires issuers of securities to disclose. Thus, Farach has plausibly pleaded that Switch violated item 503 by failing to discuss and explain the risks of its new sales strategy.

### 2. *Switch's ability to replicate the success of the Las Vegas data center*

Defendants argue that they did not mislead investors about the prospects for the Grand Rapids and Atlanta data centers because the registration statement warned that revenue from the new data centers was uncertain. (ECF No. 60). These warnings mentioned that almost all of Switch's revenue comes from the Las Vegas data center and that the new data centers presented greater risk because the demand in those markets may not support the new facilities. *See id*. The court agrees.

Farach does not allege in the complaint or identify in his response that any portion of the registration statement forecasted that the Grand Rapids and Atlanta data centers would have a similar degree of success as the Las Vegas data center. (ECF Nos. 58, 78). Instead, the

registration statement discloses Switch's growth strategy and discusses the risks of the growth strategy without comparison to the Las Vegas facility. (ECF No. 62-1). These representations did not mislead investors into believing that the new data centers would replicate the success of the Las Vegas data center because "skilled investors are aware that a corporation's performance . . . in a new market is unlikely to replicate past successes." *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (9th Cir. 1992).

Further, defendants aptly note that the registration statement explains that the Las Vegas data center generates almost all of Switch's revenue and that the new data centers may not be profitable due to various market risks. (ECF No. 62-1). These statements expressly distinguish the market conditions for the new data centers from the market conditions in Las Vegas. Thus, any disclosures on the unique market advantages in Las Vegas would not have caused a reasonable investor to think differently about the nature of his or her investment. *See Rubke*, 551 F.3d at 1161.

Accordingly, Farach has failed to plead that defendants' violated section 11 by misleading investors into believing that the new data centers would replicate the success of the Las Vegas data center.

### 3. *Switch's alleged misrepresentation of revenue*

Switch's registration statement included $9,400,000.00 for colocation services with eBay in its recurring revenue report for the first six months of 2017. (ECF No. 62-1). Farach argues that Switch should not have included this amount in the revenue report because eBay was going to use the corresponding colocation services in 2018. (ECF Nos. 58, 78). Farach further argues that this misrepresentation was material because it increased Switch's revenue growth from 13% to 20%. *Id*.

Farach has not provided and the court is not aware of any authority precluding issuers of securities from including amounts that customers are contractually obligated to pay in recurring revenue reports. Moreover, it is irrelevant that eBay was not going to use colocation services under the contract until 2018 because eBay became obligated to pay for the licensed space in the first six months of 2017. *See* (ECF Nos. 58, 60). Thus, Farach has failed to allege a concrete

falsehood or omission in the recurring revenue report and his section 11 claim with respect to the eBay contract cannot succeed.

   *ii. Section 15 of the Securities Act*

Section 15 of the Securities Act provides that "[e]very person who . . . controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as the controlled person[.]" 15 U.S.C. § 77o. To state a section 15 claim, a plaintiff must allege (1) a primary violation of the Securities Act and (2) that the defendant controlled the primary violator. 15 U.S.C. § 77o; *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

Defendants argue that Farach has failed to state a section 15 claim because he has not alleged a primary violation of the Securities Act. (ECF No. 60). However, as the court explained in section VI(b)(i)(1), Farach has plausibly pleaded that defendants violated section 11 by failing to disclose that Switch had implemented a new sales strategy and the risks arising from that strategy. Therefore, the court will not dismiss Farach's section 15 claim.

## V. Conclusion

The court will adopt in part and reject in part Magistrate Judge Ferenbach's recommendation and strike only footnotes 4 and 7 from the amended complaint. The court will also dismiss Farach's section 11 claim as it pertains to (1) misleading investors that the new data centers would replicate the success of the Las Vegas data center and (2) including the eBay contract in the recurring revenue report for the first six months of 2017.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Magistrate Judge Ferenbach's report and recommendation (ECF No. 88) be, and the same hereby is, ADOPTED in part and REJECTED in part, consistent with the foregoing.

IT IS FURTHER ORDERED that defendants' motion to strike (ECF No. 63) be, and the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.

/ / /

/ / /

1    IT IS FURTHER ORDERED that defendants' motion to dismiss (ECF No. 60) be, and
2 the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.
3    DATED THIS 12th day of July 2019.

_____
JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE